UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TERESA HELM,

    Plaintiff,  CASE NO:

v.

DARREN K. INDYKE and RICHARD D. KAHN,
in their capacities as the executors of the
ESTATE OF JEFFREY EDWARD EPSTEIN,

    Defendants.

_____

**<u>COMPLAINT</u>**

Boies Schiller Flexner LLP

Plaintiff Teresa Helm, by her attorneys Boies Schiller Flexner LLP, for her Complaint against Defendants, Darren K. Indyke and Richard D. Kahn in their capacities as the executors of the Estate of Jeffrey Edward Epstein ("Epstein"), avers upon personal knowledge as to her own acts and status and upon information and belief and to all other matters as follows:

## NATURE OF THE ACTION

1. This suit arises out of Jeffrey Epstein's sexual abuse of Plaintiff.

2. Teresa was sexually trafficked by Epstein, Sarah Kellen, and Ghislaine Maxwell as part of Epstein's organized ring of procuring young women for sex. She was recruited by a woman who worked for Epstein and who offered Teresa the opportunity to become a traveling masseuse. As Teresa was studying massage at the California Healing Arts College, this seemed like a dream opportunity, but her hopes were dashed when it quickly turned into sexual assault.

3. Epstein's trafficking scheme involved recruiting young females by making false promises and using his wealth, power and threats to intimidate the females into submission to his demands. This same pattern was repeated numerous times with numerous young women.

4. As United States District Judge Kenneth Marra found, "From between about 1999 and 2007, Jeffrey Epstein sexually abused more than 30 minor girls . . . at his mansion in Palm Beach Florida, and elsewhere in the United States and overseas. . . . In addition to his own sexual abuse of the victims, Epstein directed other persons to abuse the girls sexually. Epstein used paid employees to find and bring minor girls to him. Epstein worked in concert with others to obtain minors not only for his own sexual gratification, but also for the sexual gratification of others." *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1204 (S.D. Fla. 2019) (internal citations omitted).

5. Epstein organized this sex trafficking network to obtain hundreds of young females for himself for sex, and also lent these females out to other powerful and wealthy individuals to be sexually abused.

6. Epstein conspired with others and hired staff to maintain and keep secret this network of sexual abuse for years, which sprawled throughout Epstein's residences in New York, Florida, New Mexico, the United States Virgin Islands, and Paris. Epstein's preference was to have three different young females a day for his sexual pleasure.

7. Despite his significant criminal activity, in 2008 Epstein received a shockingly minimal charge, pleading guilty to a single Florida state law charge of procuring a minor for prostitution and a non-prosecution agreement (a "NPA") with the U.S. Attorney for the Southern District of Florida. Unknown to the public and the victims at the time, Epstein's lawyers were pressuring the Government to commit to the NPA without informing the victims. Epstein's multiple victims were kept in the dark and told to be "patient" while Epstein's lawyers worked to protect him and other potential co-conspirators from prosecution. Epstein served one year in jail, but was afforded the privilege of being able to leave the jail to go to work for twelve hours per day, six days per week.

8. The NPA allowed Epstein to escape proportionate punishment for his actions and to continue operating his sex trafficking enterprise with liberty.

9. A few years later, Epstein flippantly referred to his sexual abuse of multiple minors, and the slap on the wrist he had received for it, in a 2011 interview with the New York Post: "Billionaire pervert Jeffrey Epstein is back in New York City – and making wisecracks about his just-ended jail stint for having sex with an underage girl. 'I am not a sexual predator, I'm an offender,' the financier told The Post yesterday. 'It's the difference between a murderer and a

person who steals a bagel,' said Epstein." Amber Sutherland, *Billionaire Jeffrey Epstein: I'm a Sex Offender Not a Predator*, N.Y. Post (Feb. 25, 2011),

https://nypost.com/2011/02/25/billionaire-jeffrey-epstein-im-a-sex-offender-not-a-predator/.

10. In August 2018, just one year before his death, Epstein told a New York Times reporter "that criminalizing sex with teenage girls was a cultural aberration and that at times in history it was perfectly acceptable." James B. Stewart, *The Day Jeffrey Epstein Told Me He Had Dirt on Powerful People*, N.Y. Times (Aug. 12, 2019),

https://www.nytimes.com/2019/08/12/business/jeffrey-epstein-interview.html.

11. When Plaintiff was 22 years old, Epstein added her to his long list of victims by committing sexual assault and battery against her. As such, Epstein is responsible for battery and intentional infliction of emotional distress pursuant to New York common law. The damage to Plaintiff has been severe and lasting.

12. This action has been timely filed pursuant to N.Y. C.P.L.R. § 215(8)(a), which provides that a plaintiff shall have at least one year from the termination of a criminal action against the same defendant to commence an action with respect to the event or occurrence from which the criminal action arose. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's claims arise was terminated on August 29, 2019.

13. Any statute of limitations applicable to Plaintiff's claims, if any, is tolled due to the continuous and active deception, duress, threats of retaliation, and other forms of misconduct that Epstein and his co-conspirators used to silence his many victims, including Plaintiff. Epstein's actions deprived Plaintiff of the opportunity to commence this lawsuit before his death. Until his death, Plaintiff feared that Epstein and his co-conspirators would harm her or her family, or ruin her life, if she came forward.

14. Defendants are equitably estopped from asserting a statute of limitations defense. Allowing Defendants to do so would be unjust. Epstein and his co-conspirators intimidated each of his victims into silence by threatening their lives and their livelihoods. They therefore prevented Plaintiff from commencing this lawsuit before his death. By using threats, along with his wealth and power, Epstein was able to escape punishment for his intolerable and brutal crimes against countless young women and underage girls for the duration of his life.

## PARTIES

15. Plaintiff Teresa Helm is a citizen and resident of Ohio.

16. Defendant Darren K. Indyke is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

17. Defendant Richard D. Kahn is sued in his capacity as an appointed executor of the Estate of Jeffrey E. Epstein.

## JURISDICTION AND VENUE

18. Jeffrey Epstein was a citizen of the United States domiciled in the U.S. Virgin Islands at the time of his death. Jeffrey Epstein maintained a residence in the Southern District of New York. As the legal representatives of the Estate of Jeffrey E. Epstein, Darren K. Indyke and Richard D. Kahn are deemed citizens of the U.S. Virgin Islands.

19. The amount in controversy in this action exceeds the sum or value of $75,000.00 excluding interests and costs and is between citizens of different states. Accordingly, jurisdiction is proper under 28 U.S.C. § 1332.

20. Venue is proper in this Court as Epstein's sexual abuse of Plaintiff occurred in New York, New York, where he recruited her at the age of 22, physically molested her, and began grooming her for sex in his organized sex trafficking ring.

21. Many of the events giving rise to these causes of action occurred in the Southern District of New York, where a substantial amount of Epstein's property is located. Thus, venue in this district is proper. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

A. **Epstein's Sex Trafficking Enterprise**

22. Jeffrey Epstein was widely renowned as a billionaire who used his vast connections to powerful individuals, and seemingly unlimited wealth and resources, to create a web of transcontinental sex trafficking that served himself, his co-conspirators, and some of the most powerful people in the world.

23. Epstein owned multiple residences and frequently travelled between them, including at 9 East 71st Street, New York, New York 10021, where the illegal sexual crimes against Plaintiff occurred. Epstein conservatively valued his New York townhome at $55,931,000.00. Epstein conservatively valued his ranch at 49 Zorro Ranch Road, Stanley, New Mexico 87056, at $17,246,208.00. In addition, Epstein owned residences in the Virgin Islands, Florida, France, and even on his own island, Great St. James Island, where his transcontinental sex trafficking of hundreds of young females servicing him, his co-conspirators, and wealthy and powerful individuals around the world occurred.

24. The allegations herein concern Epstein's tortious acts against Plaintiff while in New York, where Epstein was staying at his 71st Street mansion.

25. At all times material to this cause of action, Jeffrey Epstein utilized his seemingly unlimited power, wealth, and resources, as well as his deep connections to powerful and politically connected individuals to intimidate and manipulate his victims of sexual abuse.

26. Epstein and his co-conspirators had perfected a scheme for manipulation and abuse of young females. As part of the scheme, a female "recruiter" would approach a young female and strike up a conversation in an effort to quickly learn about the young female's background and any vulnerabilities they could expose. The recruiter would then manipulate the young female into coming back to one of Epstein's residences by offering the young female something she needed. At times the recruiter's lure would be a modeling opportunity, money for education, help for the young female's family, and a whole host of other related offers depending on their target's situation. Once in the residence, the recruiter and Epstein would work in concert to impress and intimidate the young female with displays of vast wealth, including having employees that were butlers and maids formally dressed around the house. They would also strategically place photographs of very powerful political and social figures amongst photographs and art displaying nude females in an effort to normalize the sexual abuse. They would also normalize the sexual abuse by placing a massage table and spa related products around the massage area in an effort to legitimize the area where the abuse was set to occur. Once abused, Epstein and his co-conspirators continued to manipulate the victims, using their financial power, promises, and threats to ensure that the victim returned as directed and remained compliant with their demands.

**B.      The Arrest, Prosecution, and Death of Epstein**

27. The sexual trafficking ring described herein started at least as early as 1995 and continued up until at least July 2, 2019, when the U.S. Attorney's Office for the Southern District of New York ("SDNY") charged Epstein with sex trafficking conspiracy and sex trafficking in violation of 18 U.S.C. § 1591. He was arrested on July 8, 2019, pursuant to the SDNY's Sealed Two Count Indictment, which is attached as Exhibit A.

28. The Indictment described Epstein's conduct and his abuse and trafficking of females in the same trafficking operation he used to abuse and traffic Plaintiff.

29. Epstein's last will and testament (the "Will") was executed on August 8, 2019, at the Metropolitan Correctional Center. The witnesses were Mariel Colón Miró and Gulnora Tali. The Will included affidavits from Darren K. Indyke and Richard D. Kahn, in which they swear an "Oath of Willingness to Serve as Executor and Appointment of Local Counsel."

30. Epstein was found dead in his cell at the Metropolitan Correctional Center on August 10, 2019.

31. Epstein's last will and testament was filed on August 15, 2019, in the Probate Division of the Superior Court of the Virgin Islands.

32. Darren K. Indyke and Richard D. Kahn filed a Certificate of Trust in the Superior Court of the Virgin Islands for Epstein's 1953 Trust on August 26, 2019. *See* Certificate of Trust, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Aug. 26, 2019).

33. Epstein's will was entered into probate on September 6, 2019, and the Superior Court of the Virgin Islands accordingly authorized Darren K. Indyke and Richard D. Kahn to administer Epstein's estate. *See* Order for Probate, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019); Letters Testamentary, *In the Matter of the Estate of Jeffrey E. Epstein*, Probate No. ST-19-PB-80 (Super. Ct. V.I. Sept. 6, 2019).

34. The Will's first article directs Epstein's executors "to pay from my estate all expenses of my last illness, my funeral and burial expenses, the administration expenses of my estate and all of my debts duly proven and allowed against my estate." The Will further directs that "after the

payments and distributions provided in Article FIRST," Epstein "give[s] all of my property, real and personal, wherever situated . . . to the then acting Trustees of The 1953 Trust."

35. Following Epstein's death, SDNY submitted a proposed nolle prosequi order in the criminal matter against him because it was required by law to do so after Epstein was deceased. On August 29, 2019, U.S. District Judge Richard Berman formally dismissed SDNY's indictment against Epstein, terminating the criminal action against him. Plaintiff's claims are therefore timely under N.Y. C.P.L.R. § 215(8)(a).

C. **Teresa Helm**

36. In or around September 2002, Teresa was 22 years old and living in Santa Monica, California. She was working towards obtaining her certificate in massage therapy at the California Healing Arts College. A fellow massage therapy student approached Teresa and asked her if she would be interested in a traveling masseuse position. The student explained to Teresa that the position involved traveling around the world on a private jet with a wealthy couple. Teresa expressed interest.

37. The student arranged for Teresa to meet an employee of the couple at Santa Monica beach. That woman was Sarah Kellen, one of Epstein's co-conspirators and recruiters.

38. Teresa and Kellen discussed the position for about an hour. Kellen made the job sound like a dream, explaining that Teresa would be working for a highly educated and worldly couple in New York with their own private jet. Kellen told Teresa that she would be taken to lavish parties, receive expensive clothes, travel all over the world in luxury, and receive the best education available all around the world.

39.     About two weeks after her initial interview with Kellen, Kellen told Teresa that the couple wanted to fly her to New York for another interview. The couple bought her a ticket for a flight from California to New York City.

40.     When she arrived, a driver brought Teresa to an apartment building in Manhattan, where he said Teresa would be staying. Upon information and belief, that apartment building was on 66th Street and is where Epstein housed many of the models and other young women he was abusing.

41.     Once she arrived, Teresa received instructions by telephone to go to Ghislaine Maxwell's home the following day. Maxwell is a British socialite and was one of Epstein's primary "recruiters" of young women. Teresa did as she was told and went to Maxwell's home the next day. She was greeted by a butler and shown into a large sitting room. She noticed a framed photograph of Maxwell and a former high U.S. government official in the bathroom.

42.     When Teresa went back into the sitting room, Maxwell came in wearing only a bathrobe. She and Teresa spoke for about an hour. She had set up a massage table and Teresa proceeded to give Maxwell a massage as she had been trained to do.

43.     After the massage, Maxwell informed Teresa that she would be meeting Epstein for a massage and interview. Maxwell bragged about Epstein's mansion and called it the largest brownstone in Manhattan. She then paid Teresa $100 for the massage and told her to give Epstein "whatever he wants" during his massage because Epstein "always gets what he wants."

44.     When Teresa returned to the 66th Street apartment building, she received a call with instructions to go to Epstein's mansion. She walked to Epstein's mansion as instructed and was overwhelmed by its lavishness. She was told to wait in what appeared to be an office.

45.     Eventually, Epstein led Teresa upstairs and down a hallway to his personal office.

46. Epstein asked Teresa to sit down and began asking her personal questions. He eventually asked her to give him a foot massage. She agreed and placed his foot in her lap so that she could begin the massage. As Teresa began massaging Epstein's foot, he started pressing his foot against intimate parts of Teresa's body. Teresa became uncomfortable, adjusted her position, and moved Epstein's foot up to keep it away from her body. But Epstein continued pushing his foot into her body.

47. Teresa tried to remain calm and professional despite Epstein's nonconsensual touching. She asked Epstein to change his position so she could massage him at a different angle, but Epstein continued to push his foot into her intimate parts of Teresa's body.

48. While still on the couch in Epstein's office, Epstein got close to Teresa, grabbed her chin with his hand, turned her face towards him, and said that he knew he could trust Teresa. Specifically, he said, "I know I can always trust a woman who shows her gums when she smiles." Epstein's actions terrified Teresa.

49. Epstein then got up to walk Teresa out of the room. Teresa was walking in front of Epstein when he abruptly grabbed her and proceeded to sexually assault her against her will. Teresa stopped walking and Epstein then forcefully grabbed her and sexually assaulted her again. Teresa was frozen with shock and fear. Once Epstein released her she continued walking towards the front door of the mansion.

50. Just before Teresa stepped out the front door, Epstein grabbed her buttocks and said, "Don't do anything I wouldn't do." Teresa proceeded to leave Epstein's mansion, and went back to the 66th Street apartment building.

51. Teresa was devastated that the traveling masseuse position was not what she had anticipated. She was also scared because she recognized that Epstein was a very powerful

person based on what Kellen told her and the photographs and other clear displays of wealth in his home.

52. Epstein made very clear to Teresa that he was incredibly wealthy, powerful, and regularly in contact with world leaders. In fact, in his New York mansion he had photographs displayed of significant political figures to ensure that any young female entering the home would know that he had extensive government connections. Epstein was not to be disobeyed and he made clear by his words and actions that there would be consequences if Teresa did not comply with his demands.

53. When Teresa got back to California, she received an e-mail from one of Epstein's co-conspirators thanking her for visiting New York and letting her know that Epstein and his co-conspirators would need to decide whether or not they wanted to hire her. She did not respond to the e-mail.

54. Due to the distress caused by Epstein's assault, Teresa did not finish massage therapy school with the same certification that she initially set out to achieve. Teresa also ended up leaving California and moving back to Ohio a few short months after the assault.

55. Teresa was deeply affected by the assault and she suffers severe emotional distress from an experience that has affected her for her entire life.

56. Epstein's sexual assault and battery of Teresa continues to cause her significant distress and harm.

## FIRST CAUSE OF ACTION

### (Battery)

57. Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–56 as if fully set forth herein.

58. Epstein intentionally committed battery by sexually assaulting Plaintiff when she was a young woman. As described above, Epstein intentionally touched intimate parts of Plaintiff's body in an offensive and sexual manner without her consent.

59. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's first cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

60. As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

## SECOND CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

61. Plaintiff repeats and re-alleges the allegations stated above in paragraphs 1–56 as if fully set forth herein.

62. As a direct result of these allegations as stated, Epstein committed intentional infliction of emotional distress against Plaintiff.

63. Epstein's actions, described above, constitute extreme and outrageous conduct that shocks the conscience. Epstein's plan to recruit, entice, and assault Plaintiff goes beyond all possible bounds of decency and is intolerable in a civilized community.

64. Epstein knew or disregarded the substantial likelihood that these actions would cause Plaintiff severe emotional distress.

65. A criminal action against Epstein with respect to the same sex trafficking enterprise from which Plaintiff's second cause of action arises was terminated on August 29, 2019, less than one year prior to the filing of this Complaint. *See* N.Y. C.P.L.R. § 215(8)(a).

66. As a direct and proximate result of Epstein's conduct, Plaintiff has in the past and will in the future continue to suffer extreme emotional distress, humiliation, fear, psychological trauma, loss of dignity and self-esteem, and invasion of her privacy.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; costs of suit; attorneys' fees; and such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated: November 12, 2019.

/s/ Joshua I. Schiller

David Boies
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

Joshua I. Schiller
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300

Sigrid McCawley
(Pro Hac Vice Pending)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011